285 A.2d 387.

RICHARD G. BOOKBINDER *et al. vs.* VINCENT ROTONDO *et al.*

JANUARY 4, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

PAOLINO, J. This complaint was brought to recover damages for injuries allegedly sustained in a rear-end collision between an automobile operated by the plaintiff, Richard G. Bookbinder, and one operated by the defendant, Charles W. Papi, and owned by the defendant, Vincent Rotondo. The cases were tried before a justice of the Superior Court sitting with a jury and resulted in verdicts for the defendants. After the trial justice denied their motion for a new trial, the plaintiffs filed an appeal to this court from the judgments entered in the Superior Court. Their assignment of errors includes an objection to the denial of their motion for a new trial. They also challenge the validity of other actions and rulings of the trial justice during the course of the trial. The plaintiffs have briefed and argued their appeal under five main points and for convenience we shall treat this appeal in like manner.

The alleged accident occurred on Main Street in the town of East Greenwich on the night of August 7, 1965. Richard G. Bookbinder's wife, Dorothy, his brother-in-law, Joel Zarum, and the latter's wife, Marjorie Ann Zarum, were riding with him. Mrs. Marjorie Ann Zarum is not a party in these cases.

The following is plaintiffs' version of what happened. Immediately prior to the accident the Bookbinder car was stopped in a line of traffic when it was struck in the rear by defendant's car. They testified that both cars were damaged and they described the damage they claimed was caused by the accident. According to plaintiffs' story there was damage to the rear of the Bookbinder car and damage to the grille, bumper and hood of defendant's car. After the accident they went to a country club, stayed about twenty minutes, and then left. The first time they sought medical attention was four days after the accident when they all went to see a doctor at the Miriam Hospital

emergency room. They described their injuries and testified as to the period of time they were out of work as the result of such injuries. Mrs. Dorothy Bookbinder complained of injuries to her right hand and to her back and testified she was unable to work for eight weeks because her hand was painful and because she could not sit for any length of time. Richard G. Bookbinder claimed five weeks of disability because of injuries to his neck and back. The Bookbinders testified they were employed by a family-owned company, the Bookbinder Plumbing & Heating Co., Inc., he as an estimator at a salary of $300 a week, and she as a bookkeeper at a salary of $100 a week. At the time of the accident the Bookbinders had their office and telephone in their home.

The plaintiff, Joel Zarum, testified about his injuries. He said he was treated by the doctor for six or seven weeks, and that he was totally disabled for six weeks and partially disabled for two weeks. He was employed as a business manager at a salary of $130 a week by a local retail jewelry house. He also stated that he had a prior existing hernia condition which did not prevent him from working.

The doctor who treated plaintiffs was called as a witness by them. He described their injuries, which he said were causally connected with the accident in question, and testified that as a result of such injuries they were unable to do their regular work for certain periods of time. The medical bills were introduced in evidence through the doctor.

The plaintiffs called Donald E. Kettelle as a witness. He testified that in August of 1965 he was employed by the town of East Greenwich as a patrolman with that police department; that he investigated the accident in response to a radio message; that as a result of his observation he determined that there was minor damage to both vehicles; that the Bookbinder car had been struck in the rear by defendant's car; that plaintiffs complained of whiplash in-

juries; that although there was no broken glass in the street there were 12 feet of skid marks behind defendant's car; and that it was his belief that the skid marks had been left there by defendant's car.

The defendant, Charles W. Papi, who was called as an adverse witness by plaintiffs, testified in substance as follows. On the night in question he was driving a car which he had borrowed from the other defendant's son; that just prior to the alleged accident he was going southerly on Main Street at about 20 miles per hour behind plaintiff Bookbinder's car and had reduced his speed to 15 miles per hour to make a turn when he saw a yellow caution light; that he was 6 feet behind the Bookbinder car when he saw the brake lights go on and the car stopped short; and that he applied his brakes and managed to stop before there was any collision or impact.

Mr. Papi's wife, who was with him on the night in question, corroborated her husband's testimony. The defendant, Vincent Rotondo, and his son, John, testified in substance that the car had not been damaged on the night of August 7, 1965, and that when Mr. Papi returned it, the car was in the same condition as it was when it was loaned to him.

Richard G. Bookbinder appeared as a witness in his capacity as an officer of Bookbinder Plumbing & Heating Co., Inc., and presented the payroll records of his company. Over his objection he was ordered to read into the record, in the presence of the jury, the company's payroll records of Richard and Dorothy for the periods of their respective disabilities. These records were later, over their objection, introduced into evidence.

After the conclusion of Richard Bookbinder's testimony, the trial justice permitted defendants, over plaintiffs' objection, to introduce Joel Zarum's W-2 form for the year 1965.

When both parties rested, the case was submitted to the jury. After the occurrence of certain incidents which we shall discuss during our consideration of plaintiffs' arguments, the jury returned verdicts for defendants in all six cases.

## I

Under point I plaintiffs argue that the trial justice committed reversible error through his exercise of coercion upon the jury. We do not agree.

The case was tried on December 2, 3 and 4, 1969. On December 4, 1969, the case was given to the jury at approximately 12:30 p.m. It returned at 4 p.m. and indicated a finding for plaintiffs for "[m]edical expenses only." After instructing it that its verdicts must be for a sum certain the trial justice permitted the jury to retire for further deliberation. It returned at 4:20 p.m. He reinstructed the jury, admonished it against returning a "compromised verdict," and read to it his recollection as to the amount of plaintiffs' medical bills. During the course of these supplemental instructions he said:

"If you disagree, if you're what is known as a 'hung jury' come back and tell us and I'll discharge you and we'll try this case again before another jury, although I don't think we can find another more capable jury."

The jury then retired and at 5:20 p.m. it returned to the courtroom. When the trial justice asked the jury whether it had anything to report, the foreman said:

"We did our best, Your Honor, with the thing. We came up with the same conclusion. After coming up with the same thing, it wasn't acceptable. We're just hung."

The trial justice asked: "You cannot reach an agreement?" To which the foreman replied: "Not presently, we cannot."

He then permitted the members of the jury to disband

to their homes with the understanding that they would reassemble in the same courtroom at 9:30 a.m. the following day. He admonished them that they should speak to no one about the case.

On the following morning the jury reassembled as instructed. After receiving further instructions it was permitted to retire at 9:45 a.m. and at 11:20 a.m. it returned verdicts for defendants.

The plaintiffs argue that the trial justice's failure to discharge the jury when he was told by the foreman it was "just hung" violated his promise to it and created in the minds of the members of the jury the reasonable inference that he would not discharge the jury until it arrived at a verdict. The trial justice's action, the plaintiffs argue, constituted an act of coercion upon the jurors who at that time ought to have been discharged. We cannot agree with plaintiffs' interpretation of what the trial justice said or did at this time. When the jury should be released from considering a case if unable to agree on a verdict lies in the sound discretion of the court. *Smith* v *Campbell,* 82 R. I. 204, 207, 107 A.2d 338, 340 (1954). When asked whether the jurors could agree on verdicts, the foreman did not say they were hopelessly deadlocked or hung; he merely said that they could "not presently" reach an agreement. In the circumstances the trial justice was justified in not discharging the jury and in giving it more time to deliberate. His action did not coerce the jury into an agreement; it would be unreasonable to infer from his action that he would not discharge the jury until it had arrived at verdicts. His failure to discharge it thus did not constitute an abuse of discretion.

The plaintiffs next argue that the instructions given by the trial justice to the jury when it reassembled at 9:30 a.m. constituted an exercise of coercion on the jury. They assert that the trial justice overemphasized the cost en-

tailed in trying a case both to the parties and to the state by indicating that failure to reach verdicts would result in enormous expense to everyone concerned. The plaintiffs refer specifically to the following portions of his instructions:

"If this trial results in disagreement, another trial will have to ensue, with a consequent loss of time and money, both to the State, plaintiff and defendant.

"It takes time, it takes money to have these trials as you see right here in your pay alone. For jurors, it costs more than two hundred dollars a day to run this Court, but that's not the important thing. The important thing is that we resolve this dispute between these people."

We fail to see how this language amounted to coercion when read in the context of the entire charge in the circumstances then present. Also, we have the benefit of guidelines established by this court many years ago in *Smith* v. *Campbell, supra,* at 206, 107 A.2d at 339-40:

"The basic principle to which the courts uniformly adhere in dealing with allegedly coercive instructions is that a trial justice must not interfere with the free and unbiased judgment of the jury. We know of no general rule by which to determine whether the questioned remarks, which vary widely in form and substance in each case, have in fact violated that principle. Broadly speaking, a trial justice exceeds his authority if it fairly appears that the challenged statement or direction operates to coerce the jury into an agreement. In each instance the propriety of his remarks addressed to a jury after retirement must be measured by the ordinary meaning of the language employed in the light of the surrounding circumstances and the subject matter under discussion."

The plaintiffs' final argument under point I is that in delivering what he thought was a correct statement of the Allen charge, so-called, see *Allen* v. *United States,* 164 U. S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the trial justice mis-

stated the charge because it did not contain an admonition to the jurors that they should abide by their own convictions, and that they shall not abandon their own personal convictions arbitrarily. The plaintiffs refer specifically to the following language:

> "I am going to ask the minority, if there is a minority, to listen to the others, and to exchange views and arguments in an honest effort to come to a decision in this case."

The trial justice also instructed the jurors that "It is not required that you yield your conviction because a majority holds to a contrary conviction * * *." A fair reading of the questioned language is sufficient to show that the jurors were not misled thereby. The charge, as quoted, contains a statement that a verdict must be a juror's own verdict, the result of his own convictions, and not a mere acquiescence in the opinion of others. We find no error in the charge as given.

## II

The plaintiffs' next contention is that the trial justice committed reversible error in permitting the jurors to disband overnight after the case had been submitted to them subsequent to commencement of deliberations but prior to agreement upon verdicts. They frankly concede that they can find no case in this country which holds that such a separation is per se a ground for reversal. They also admit that the rule is quite generally accepted that in the absence of particular prejudicial circumstances affecting the situation, verdicts will not be set aside because the jurors dispersed temporarily after submission of the cause and prior to their agreeing upon verdicts. See Annot. 77 A.L.R.2d 1086, entitled "Separation or dispersal of a jury in civil cases after submission." Notwithstanding their concession the plaintiffs argue that in the circumstances of

this case the separation of the jurors should constitute ground for reversal.

This question presents a novel issue in this state, but the procedure followed by the trial justice has been followed in other jurisdictions. *See Enga* v. *Sparks*, 315 Mass. 120, 51 N.E.2d 984 (1943); *Cook* v. *Miller*, 103 Conn. 267, 130 A. 571 (1925); *McDowd* v. *Pig'n Whistle Corp.*, 26 Cal.2d 696, 160 P.2d 797 (1945); *Byrne* v. *Matzcak*, 254 F.2d 525 (3rd Cir. 1958), *cert. denied*, 358 U. S. 816, 79 S.Ct. 24, 3 L.Ed. 58 (1958). We believe that the procedure followed by the trial justice, under proper cautionary instructions, is sound. Juries are less likely to reach impartial verdicts when they are kept at their deliberations to the point of exhaustion rather than after a good night's rest. Since in civil cases juries have been traditionally permitted to separate each night after the taking of testimony during trial, the probability of corruption from such dispersal is not of such overwhelming danger. Finally, the trial justice is in the best position to decide whether the time has come when it is better to allow the jury to disband for the evening.

We find no merit in the plaintiffs' argument that the separation of the jurors amounted to coercion. The situation here did not involve enforced prolonged deliberations. See 93 A.L.R.2d 627, 632. The plaintiffs have failed to show affirmatively any prejudice to them resulting from the separation of the jurors. In these circumstances, proper cautionary instructions having been given and absent an affirmative showing of any prejudice, we find no ground of reversal here.

### III

We consider next plaintiffs' contention that the trial justice erred in permitting the introduction of evidence regarding the earnings of the plaintiffs. The trial justice, over plaintiffs' objection, permitted the introduction of the payroll records of Bookbinder Plumbing & Heating Co., Inc.

and the W-2 form of Joel Zarum for the year 1965 into evidence. He concluded that on the state of the record when he admitted this evidence, one of the issues was whether or not plaintiffs were out of work at all during the periods of their alleged disabilities.

In admitting these records the trial justice gave the jury a cautionary instruction on the collateral source rule. He warned it that this evidence was relevant only to the question of whether or not plaintiffs were out of work and he explained that introduction of these documents was for a limited purpose, namely, to show in some way that plaintiffs had lost no time from work. He also cautioned the jury at the time the evidence was introduced that if it found that plaintiffs were in fact disabled it should make no allowance to defendants despite the fact that plaintiffs were paid during their periods of disability.

The plaintiffs argue, as we understand, that the collateral source rule should be interpreted as a rule of evidence and, because of the potential prejudice inherent in such evidence, the rule should be strictly enforced. While we agree that this kind of evidence may be prejudicial if admitted without proper cautionary instructions, we are not prepared to say that it should be enforced in all cases regardless of the purpose for which it is introduced.

We agree that the prevailing rule in this country, and in this state, is that, in the absence of a statute to the contrary, the amount of recovery from a third person who is responsible for a person's injury is not to be affected by the mere receipt by the plaintiff of wages or salary from his employer for the period of his injury or a gratuity from a collateral source independent of the defendant. *Oddo* v. *Cardi,* 100 R. I. 578, 584, 218 A.2d 373, 376-77 (1966); *Coia* v. *Eastern Concrete Products Co.,* 85 R. I. 128, 133, 127 A.2d 858, 861 (1956); *Perry* v. *New England Transp. Co.,* 71 R. I. 352, 359, 45 A.2d 481, 485 (1946); *Audette* v.

*New England Transp. Co.,* 71 R. I. 420, 429, 46 A.2d 570, 574 (1946); 7 A.L.R.3d 518, *annot., Damages Collateral Source Rule.*

It does not follow, however, that the collateral source rule should be an absolute prohibition to the introduction of evidence that a plaintiff was paid by his employer during the period of alleged disability when such evidence is offered to show that plaintiff was not disabled or was in fact working or to affect the weight of his testimony that his injury caused his absence from work. *See McElwain* v. *Capotosto,* 332 Mass. 1, 122 N.E.2d 901 (1954); *compare Ridilla* v. *Kerns,* D.C. Mun. App., 155 A.2d 517 (1959). The question of whether such evidence was relevant or material rested in the discretion of the trial justice and will not be held to be reversible error unless his ruling constitutes an abuse of discretion to the prejudice of plaintiffs. *McSoley* v. *McSoley,* 91 R. I. 61, 161 A.2d 216 (1960).

The question we must determine is whether there has been an abuse of discretion to the prejudice of the plaintiffs. In deciding this issue we must bear in mind the circumstances confronting the trial justice. The evidence on the question of whether or not there had in fact been an actual impact between the two cars was in direct conflict. The nature of plaintiffs' employment presented a unique problem. The Bookbinders worked for a family business and their office and telephone were in their home. The other plaintiff had a pre-existing hernia condition.

In the peculiar circumstances here, we cannot say that the trial justice abused his discretion in admitting such evidence for the limited purpose which he described. In any event, we are satisfied that even if it were error to admit such evidence, the error was cured by the trial justice's instructions to the jury in his final charge when he again instructed it on the collateral source rule in the following language:

"As I instructed you already in this trial and will instruct you now again, any evidence that was put in during the course of this trial that these plaintiffs were paid while they were out of work, relates only to the question of whether they were out of work or whether their injuries kept them out of work. If you find that these plaintiffs were incapacitated from performing their normal work because of the injuries they sustained in this accident as a result of the defendant's negligence, then you must disregard any evidence concerning whether their employers paid them during that period of time."

## IV

Under point IV plaintiffs argue that the trial justice committed prejudicial error in not discharging the jury upon his discovery that it had become inattentive. They state that upon their argument in support of their motion for a new trial they first learned through the trial justice that his decision to disperse the jury and require it to return the following day was motivated by his own observation that the jury had become highly inattentive. Assuming that this issue is properly before us, we are not persuaded that it has any merit. The decision whether or not to discharge the jury and pass the case rested in the sound discretion of the trial justice. We are not persuaded that the failure of the trial justice constituted an abuse of discretion.

## V

The plaintiffs' final contention is that the trial justice erred in denying their motion for a new trial. They argue that the trial justice misconceived the testimony of plaintiffs' medical expert as well as the law of inertia and motion. We cannot agree with their position. It is obvious from a reading of the trial justice's decision denying the motion for a new trial that his conclusion was based on credibility. He rejected plaintiffs' version of what happened on the night of August 7, 1965, and, instead, accepted defendants' version that the damage, if any, was slight. It is also clear

that he did not believe plaintiffs' testimony with regard to their alleged injuries or disabilities. There were also other factors in the evidence which, in the judgment of the trial justice, destroyed his confidence in the credibility of plaintiffs' testimony.

There is no merit to plaintiffs' claim that the trial justice misconceived or overlooked the doctor's testimony as to objective signs of plaintiffs' injuries. He did not give any weight to the doctor's testimony because he concluded that he was relying on what plaintiffs told him and, as we have already pointed out, the trial justice rejected plaintiffs' testimony as not credible. In other words, he gave a reasonable explanation for his reluctance to accept the doctor's testimony on this issue. We cannot fault the trial justice for so doing. We are satisfied that the trial justice believed that even if there was an impact between the two cars it was so slight that plaintiffs were not injured thereby.

We have considered all of the arguments advanced by plaintiffs in support of their contention that the trial justice erred in denying their motion for a new trial. However, they have not persuaded us that the trial justice failed to perform the duties required of him under our cases, *see Handy* v. *Geary,* 105 R. I. 419, 252 A.2d 435 (1969); *Barbato* v. *Epstein,* 97 R. I. 191, 196 A.2d 836 (1964), or that having done so, he overlooked or misconceived any material evidence on a controlling issue or was otherwise clearly wrong. This was their burden. *Ionata* v. *Groise,* 107 R. I. 478, 268 A.2d 444 (1970). Since they have failed to sustain such burden, we must affirm the ruling of the trial justice denying their motion.

But even if we assume that the trial justice misconceived or overlooked material evidence, or that in passing on the motion for a new trial he otherwise failed to perform his duty in accordance with our cases, we are satisfied, after independently examining the transcript for ourselves, that

360

there is competent evidence to sustain the verdicts and that it does not strongly preponderate against them. In such circumstances we do not disturb the verdicts. *Ionata* v. *Groise, supra.*

The judgments are affirmed.

*Friedman, Kramer, Kessler & Andreoni, Harold I. Kessler,* for plaintiffs.

*Gunning, LaFazia, Gnys & Selya, Raymond A. LaFazia,* for defendants.